FILED
2026 NOV 2 PM 12:29
CLERK
U.S. DISTRICT COURT

**AARON BOOKER**
20 South Main Street, Unit 163
Bountiful, Utah 84011
Telephone: (385) 350-0517
aaron.booker.litigation@gmail.com
Plaintiff Pro Se

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| AARON BOOKER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF AMERICAN FORK, a Utah municipal corporation;<br>BRONSON KITCHEN, in his individual capacity; and<br>DOES 1–10, inclusive,<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case: **1:26–cv–00221**<br>Assigned To : **Pead, Dustin B.**<br>Assign. Date : **11/2/2026**<br>Description: **Booker v. City of American Fork et al** |

COMES NOW Plaintiff AARON BOOKER ("Plaintiff" or "Mr. Booker"), appearing pro se, and for his Complaint and Jury Demand against Defendants CITY OF AMERICAN FORK ("American Fork" or the "City"), Detective/Officer BRONSON KITCHEN ("Defendant Kitchen"), and DOES 1–10 (collectively, "Defendants"), hereby alleges upon personal knowledge as to his own acts and experiences, and upon information and belief as to all other matters, as follows:

## I. PRELIMINARY STATEMENT

**1.** This is a civil rights action brought pursuant to 42 U.S.C. § 1983 to vindicate fundamental constitutional protections guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

**2.** Law enforcement officers are entrusted with extraordinary authority to detain citizens and enforce the law. That authority, however, is strictly circumscribed by the United States Constitution, territorial jurisdictional boundaries, and the fundamental requirement of reasonable suspicion or probable cause. When an officer abandons those constitutional constraints to conduct an unauthorized, off-the-books extraterritorial traffic stop as an intimidation ploy, refuses a calm and compliant driver's credentials in order to demand his window be rolled down further, threatens to summon another law enforcement agency to shatter that compliant driver's window, unlawfully prolongs the detention by refusing to either issue a citation or terminate the stop—holding the driver hostage on the roadside until provoking understandable vocal agitation—and subsequently fabricates an official police report seven days after a recorded confession to cover up admitted misconduct, the Constitution demands accountability.

**3.** On May 21, 2026, at approximately 16:25 (4:25 PM), while Plaintiff Aaron Booker was lawfully operating his motor vehicle on Interstate 15 near Exit 317 (on the left for US-89 S / 500 West) in Davis County, Utah—nearly forty miles outside the municipal boundaries of the City of American Fork—Defendant Bronson Kitchen, an officer and detective with the American Fork Police Department ("AFPD"), initiated an unlawful traffic stop under the false pretext of a High Occupancy Vehicle ("HOV") lane violation.

**4.** Plaintiff's objective vehicle dashcam footage conclusively demonstrates that both the HOV restriction and double-white lines had terminated near Parrish Lane (Exit 319) prior to Plaintiff entering the Exit 317 lane. Furthermore, the recording captures Defendant Kitchen driving parallel to another solo-occupant vehicle traveling in the active HOV lane and taking zero enforcement action against it—only targeting Plaintiff after Plaintiff passed his patrol vehicle and merged into the same general exit lane.

**5.** Operating without an activated body-worn camera, with an in-car dashcam system not set to record audio, and without calling the stop into dispatch, Defendant Kitchen conducted an off-the-books roadside detention. At the inception of the stop, Plaintiff was completely calm and cooperative, with the clear and immediate intention of voluntarily presenting his credentials (registration, insurance, and driver’s license). Rather than accepting Plaintiff’s calmly offered documents, Defendant Kitchen refused to take them and demandingly insisted that Plaintiff roll his window down further.

**6.** While Plaintiff was calmly handing his credentials forward without any coercion, Defendant Kitchen became visibly agitated—or “amped up”—and immediately resorted to unlawful threats of physical force and property destruction, threatening to summon the Utah Highway Patrol (“highway”) to shatter Plaintiff’s passenger-side vehicle window. When Plaintiff calmly asked why he was being stopped and explained that the lane was a general-purpose exit and that the HOV lane ended back at Parrish Lane, Defendant Kitchen falsely insisted the exit was “not for you” and “not an exit lane for single drivers.” It was only AFTER Defendant Kitchen threatened to have Plaintiff’s window broken, refused to accept his calmly offered credentials, insisted on a patently false HOV-exit theory, and refused to either issue a citation or let Plaintiff go after explicitly confirming Plaintiff was detained—that Plaintiff became visibly

frustrated, agitated, and upset, vocally demanding his ticket and ultimately rolling up his window to terminate the unauthorized interrogation when he was done engaging in Officer Kitchen's illegal antics.

**7.** Following the termination of the unlawful detention, when Plaintiff sought to obtain Defendant Kitchen's name and badge number as required by basic police transparency, Defendant Kitchen declared "our interaction was over," rolled up his window, and drove away, concealing his identity to evade oversight.

**8.** Only after Plaintiff immediately submitted a Government Records Access and Management Act ("GRAMA") request on May 22, 2026, and published his dashcam recording of the encounter on the "LackLuster" YouTube channel—amassing over 1,000,000 views and generating widespread public outrage—did the City of American Fork, Mayor Brad Frost, and AFPD Chief Cameron Paul intervene.

**9.** On May 27, 2026, at 11:16 AM, AFPD Chief Cameron Paul telephoned Plaintiff and spoke with him in a substantive nine-minute conversation. During this call, Chief Paul explicitly admitted that Defendant Kitchen was in the wrong, stated that he was ordering Defendant Kitchen to call and apologize, and emphasized that what bothered him the most was Defendant Kitchen implicating another law enforcement agency (the Utah Highway Patrol) in a threat to break Plaintiff's vehicle window.

**10.** Later that same day, on May 27, 2026, at 14:47 (2:47 PM), in a recorded telephone call with Defendant Kitchen and his supervisor, AFPD Sergeant Stowers, Defendant Kitchen explicitly admitted to Plaintiff that (a) the legal basis for the traffic stop was completely erroneous because he had falsely assumed the lane was an HOV exit-only lane, and (b) he had

improperly escalated the encounter and should never have threatened to have another agency break Plaintiff's window.

**11.** Despite this recorded confession of unconstitutional conduct made on May 27, 2026, Defendant Kitchen waited seven days and—on June 3, 2026—authored and finalized Official AFPD Incident Report No. 26AF04748. In that report, Defendant Kitchen inserted newly fabricated, post-hoc pretexts ("aggressively switching lanes, following too closely to vehicles in front of him and speeding"), invented a false claim that he stopped Plaintiff for crossing a double-white line, and selectively weaponized Plaintiff's later vocal frustration—omitting that Plaintiff was initially calm, fully compliant with statutory requirements by offering his credentials, and only became visibly upset after Defendant Kitchen threatened his window and refused to either complete the stop or let him go.

**12.** Furthermore, Plaintiff's experience is not an isolated aberration. Rather, as acknowledged in recorded meetings between municipal stakeholders and City leadership (including Mayor Brad Frost and Chief Cameron Paul on August 10, 2026), it is symptomatic of an entrenched, systemic pattern and practice within the City of American Fork Police Department of violating citizens' First and Fourth Amendment rights, concealing officer identities to obstruct public accountability and Brady/Giglio tracking, conducting unlawful searches and seizures (as documented in parallel civil rights litigation including Norcross et al. v. City of American Fork et al., Case No. 2:26-cv-01008-RJS, and Thorpe et al. v. Cedar Hills City et al.), and failing to meaningfully discipline or remove repeat constitutional offenders from sensitive positions, including Defendant Kitchen's assignment as a School Resource Officer ("SRO").

**13.** Plaintiff brings this action to hold Defendants accountable for their deliberate violations of clearly established constitutional law, and seeks compensatory damages, punitive damages, declaratory and injunctive relief, and all other relief deemed just and proper by this Court.

## II. JURISDICTION AND VENUE

**14.** This action arises under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and is brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988.

**15.** This Court has original subject matter jurisdiction over Plaintiff's federal constitutional claims pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3)–(4) (civil rights jurisdiction).

**16.** This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65.

**17.** Venue is proper in the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1391(b) because Defendants reside and are headquartered within the District of Utah, and all events, acts, and omissions giving rise to Plaintiff's claims occurred within the State and District of Utah.

## III. PARTIES

**18.** Plaintiff AARON BOOKER is, and at all relevant times mentioned herein was, an individual and citizen of the United States residing in the State of Utah. Plaintiff is not a resident of the City of American Fork.

**19.** Defendant CITY OF AMERICAN FORK is a municipal corporation and political subdivision organized and existing under the laws of the State of Utah, located in Utah County, Utah. Defendant City of American Fork operates, manages, directs, and controls the American Fork Police Department ("AFPD"), and is responsible for the policies, practices, customs, training, supervision, and discipline of AFPD officers, including Defendant Kitchen.

**20.** Defendant BRONSON KITCHEN is, and at all relevant times mentioned herein was, a sworn law enforcement officer, detective, and School Resource Officer employed by the City of American Fork Police Department. At all relevant times, Defendant Kitchen was acting under color of state law and within the scope of his employment with Defendant City of American Fork. Defendant Kitchen is sued in his individual capacity.

**21.** Defendants DOES 1–10 are supervisory officials, officers, or employees of the City of American Fork Police Department whose true names and capacities are presently unknown to Plaintiff, who participated in, authorized, ratified, or failed to prevent the constitutional violations alleged herein, including the review, approval, and retention of Defendant Kitchen's falsified June 3, 2026 police report (Incident Report No. 26AF04748). Plaintiff will seek leave to amend this Complaint to allege their true names and capacities when ascertained.

## IV. GENERAL FACTUAL ALLEGATIONS

### A. The May 21, 2026 Unlawful Extraterritorial Stop on Interstate 15

**22.** On May 21, 2026, at approximately 16:25 (4:25 PM), Plaintiff Aaron Booker was driving his personal motor vehicle (a dark Jeep) on Interstate 15 ("I-15") near Exit 317 on the

left for US-89 S / 500 West in Davis County, Utah—roughly forty miles outside the territorial jurisdiction of the City of American Fork, which is located in Utah County.

**23.** Prior to pulling Plaintiff over, Defendant Bronson Kitchen was operating an AFPD law enforcement vehicle on I-15. Objective dashcam footage from Plaintiff's vehicle shows Defendant Kitchen driving directly alongside another motor vehicle that was actively traveling in the restricted HOV lane with a visibly vacant passenger seat. Defendant Kitchen took no action to stop that vehicle.

**24.** Shortly thereafter, prior to Exit 317—and after the HOV restriction and double-white lane markings had legally terminated back near Parrish Lane to become a general-purpose exit lane—Plaintiff passed Defendant Kitchen's vehicle and lawfully merged into the lane.

**25.** Despite lacking any reasonable suspicion or probable cause that Plaintiff had committed any traffic infraction or crime, and despite operating roughly forty miles outside his primary municipal jurisdiction without territorial authority or compliance with Utah's extraterritorial policing statutes, see Utah Code § 53-13-103(3) and Utah Code § 77-9-3, as well as AFPD Policy 100.2.2 (Arrest or Enforcement Authority Outside the Jurisdiction)—which limits municipal officer authority outside primary jurisdiction to four narrow triggers (fresh pursuit, public offense in presence, originating investigation, or mutual assistance) and mandates that an officer shall notify and receive approval of the local law enforcement authority prior to taking enforcement action—and AFPD Policy 306.7 (Off-Duty / Extraterritorial Action Limits)—which restricts officers from initiating non-emergency traffic detentions outside city boundaries while commuting or returning from off-site assignments—Defendant Kitchen activated his emergency lights at 16:25 and initiated an unauthorized traffic stop of Plaintiff's vehicle on the shoulder of the Exit 317 ramp.

**26.** Defendant Kitchen initiated this traffic stop as an unauthorized, “off-the-books” enforcement action. Defendant Kitchen did not wear or activate a body-worn camera during the encounter, operated a patrol vehicle whose dashcam was not configured to record audio—in direct violation of AFPD Policy 326.3.1 and Policy 326.4 (Mobile Audio/Video Systems), which mandate that officers activate operational audio and video recording functions during all enforcement contacts and traffic detentions—and failed to call the traffic stop into dispatch.

**B. Initial Calm Compliance, Window-Breaking Threats, Shifting Roadside Pretext, and Provoked Frustration From Prolonged Detention**

**27.** At the inception of the traffic stop, Plaintiff was completely calm, composed, and cooperative. Plaintiff lowered his driver-side window partway—sufficient to communicate clearly and pass documents, which fully satisfied his legal obligations under Utah law to display his credentials upon demand, see Utah Code § 53-3-217; Utah Code § 41-6a-209—and immediately attempted to hand over his registration, insurance card, and driver’s license ID card (military ID inadvertently).

**28.** Plaintiff was never coerced into providing his documents by any threat of force; rather, his intention from the very beginning of the encounter was to voluntarily hand over his credentials so the stop could be resolved promptly.

**29.** Rather than accepting Plaintiff’s calmly offered credentials, Defendant Kitchen refused to take them because he wanted Plaintiff’s window rolled down further. While Plaintiff was calmly holding out his documents for Defendant Kitchen to take, Defendant Kitchen became visibly agitated—or “amped up”—and escalated the encounter by threatening to call the Utah Highway Patrol (“highway”) to come to the scene and forcibly shatter Plaintiff’s passenger-side vehicle window.

**30.** While still attempting to hand over his credentials, Plaintiff calmly asked Defendant Kitchen what he was being pulled over for. Defendant Kitchen stated: "because you just went into the carpool lane and you are a single lane driver."

**31.** Plaintiff explained that the lane was an exit and that to get off on that exit, the carpool lane had already ended back at Parrish Lane. Mid-sentence during Plaintiff's explanation, Defendant Kitchen interrupted, stating, "Not for you" and "No it's not."

**32.** When Plaintiff remarked that Defendant Kitchen was upset simply because Plaintiff had passed him, Defendant Kitchen stated: "It is not an exit lane for single drivers."

**33.** Plaintiff responded, "It absolutely is!! The carpool lane ends back at Parrish Lane!! I drive this everyday!" Defendant Kitchen insisted, "It does not... no." Following this exchange, Plaintiff insisted that Defendant Kitchen take his credentials. Defendant Kitchen complied and took the documents—excluding the driver's license, which Plaintiff immediately attempted to hand over after realizing he had inadvertently presented his military ID instead.

**34.** Notably, at no point during this entire roadside exchange did Defendant Kitchen ever claim or accuse Plaintiff of crossing a solid double-white line; rather, Defendant Kitchen repeatedly insisted that Exit 317 itself was an HOV-only exit closed to single drivers.

**35.** Realizing that Defendant Kitchen was obstinately refusing to acknowledge the lawful road configuration, Plaintiff decided to stop arguing the HOV point, demanded that Defendant Kitchen finish taking his driver's license and issue him a ticket—so he could contest it in court—and verbally invoked his Fifth Amendment rights.

**36.** However, Defendant Kitchen refused to complete the traffic stop—neither issuing a citation nor releasing Plaintiff to leave. It was only at this juncture—after Plaintiff had started

the encounter completely calm and compliant, and after Defendant Kitchen had refused his credentials, threatened to have another agency shatter his passenger-side window, insisted on a false legal pretext, and refused to either complete the stop or let Plaintiff go—that Plaintiff became visibly agitated and upset.

**37.** Plaintiff's visible frustration and emphatic, profane demands that Defendant Kitchen simply "give me my ticket" were the direct, foreseeable, and provoked result of being held hostage on the side of the freeway in an unlawful, off-the-books detention by an armed officer who refused to either issue a citation or allow Plaintiff to leave.

**38.** Defendant Kitchen refused to accept Plaintiff's driver's license, stating, "I'm not taking your I.D." Plaintiff exclaimed, "Then give me my shit!" Defendant Kitchen refused to hand back Plaintiff's credentials, stating verbatim: "I'm just trying to talk to you for a moment." Knowing that an officer cannot lawfully hold a citizen's credentials hostage to force an unauthorized roadside conversation outside the scope of his lawful authority—rather than either issuing a ticket or letting the driver go—Plaintiff became extremely upset and again vocally demanded that Defendant Kitchen return his credentials and let him leave or issue the ticket. Plaintiff then calmed down and specifically asked Defendant Kitchen: "Am I detained?" Defendant Kitchen explicitly answered: "Yes." Plaintiff then responded, "Then go write my ticket," to which Defendant Kitchen repeated for a second time, "I'm not writing you a ticket," and attempted to force an unmonitored conversation by adding, "What I was going to say..." Realizing Defendant Kitchen was maintaining an unlawful, off-the-books detention without issuing a citation or releasing him, Plaintiff exercised his constitutional right to remain silent under the Fifth and Fourteenth Amendments and rolled his passenger-side window up to terminate the unauthorized interrogation. Defendant Kitchen then tapped on the window;

Plaintiff rolled it down, stated once more that he was invoking his Fifth Amendment rights, and Defendant Kitchen handed back Plaintiff's credentials while stating, "What I was going to say Mr. Booker is thank you for your service," before finally terminating the roadside detention.

**39.** Immediately following the stop, Plaintiff sought to obtain Defendant Kitchen's name and badge number for the purpose of filing a misconduct complaint. When Plaintiff pulled alongside Defendant Kitchen at a red light and requested his name and badge number, Defendant Kitchen unlawfully refused to identify himself. As Defendant Kitchen later admitted in Incident Report No. 26AF04748: "I informed Mr. Booker that our interaction was over. I rolled back up my window and continued to the freeway." Plaintiff was forced to depart the scene with only the license plate number of the police vehicle and his dashcam recording.

**C. Immediate GRAMA Request, Viral Public Exposure, and May 27, 2026 Recorded Confessions**

**40.** On May 22, 2026, Plaintiff submitted a formal GRAMA records request to AFPD Records requesting all information, reports, and recordings relating to the traffic stop.

**41.** Thereafter, Plaintiff's dashcam recording of the unlawful stop and roadside threats was published on the prominent police-accountability YouTube channel "LackLuster." The video rapidly went viral, amassing over 1 million views and drawing intense national and local scrutiny to the unconstitutional practices of Defendant Kitchen and the American Fork Police Department.

**42.** Later that day, May 22, 2026, at approximately 21:07 (9:07 PM), AFPD Sergeant Stowers initiated a 16-minute telephone conversation with Plaintiff regarding the misconduct complaint Plaintiff had submitted. During this call, Sergeant Stowers confirmed that AFPD

leadership was aware of the incident, acknowledged that he knew the identity of the involved officer—though he did not disclose Defendant Kitchen's name to Plaintiff—and disclosed that the officer was a School Resource Officer returning to American Fork from a school activity at Lagoon Amusement Park in Davis County at the time of the stop. Sergeant Stowers explicitly stated that AFPD leadership was surprised to hear that one of their SROs had conducted a traffic stop that far north outside their jurisdiction, confirming immediate municipal notice of the unauthorized extraterritorial detour.

**43.** On May 27, 2026, at 11:16 AM, AFPD Chief of Police Cameron Paul telephoned Plaintiff directly and engaged in a substantive nine-minute conversation. During this nine-minute call, Chief Paul: (a) Explicitly admitted to Plaintiff that Defendant Kitchen was in the wrong during the May 21, 2026 traffic stop; (b) Informed Plaintiff that he was ordering Defendant Kitchen to personally telephone Plaintiff to apologize; and (c) Stated that what bothered him the most about the incident was Defendant Kitchen implicating another law enforcement agency—the Utah Highway Patrol—in a threat to come break Plaintiff's passenger-side vehicle window.

**44.** Less than four hours later, on May 27, 2026, at 14:47 (2:47 PM), Defendant Bronson Kitchen and his supervisor, AFPD Sergeant Stowers, telephoned Plaintiff to deliver the Chief-ordered apology. The call was lawfully recorded, subsequently went viral, and annotates Defendant Kitchen's exact statements regarding why he pulled Plaintiff over.

**45.** During this May 27, 2026 (14:47) recorded call, Defendant Kitchen made explicit, unambiguous admissions against interest in the presence of Sergeant Stowers confirming that both the stop and his roadside escalation were unlawful: (a) Regarding the sole basis for the stop and the lack of reasonable suspicion or probable cause, Defendant Kitchen admitted that he had pulled Plaintiff over solely under the mistaken assumption that Exit 317 was an HOV exit-only

lane: “I was under the assumption that that was an HOV exit-only lane. After the fact, I have found out that that’s incorrect. I do want to apologize to you for stopping you there.”; (b) Notably, at no point during the May 27, 2026 recorded apology call did Defendant Kitchen claim that he had stopped Plaintiff for crossing a double-white line, nor did he claim he stopped him for “aggressively switching lanes, following too closely,” or “speeding.”; (c) Regarding his retaliatory escalation and threat to shatter Plaintiff’s window, Defendant Kitchen admitted: “I shouldn’t have told you that I was gonna have your window broken by another agency and let myself get amped up. I apologize for letting myself get to that.”

**D. The June 3, 2026 Post-Apology Fabrication of Official Police Report No. 26AF04748 and Subsequent GRAMA Disclosures**

**46.** Seven days AFTER confessing on the May 27, 2026 recorded call that his HOV-exit assumption was invalid and his window-breaking threat was improper, Defendant Kitchen authored and finalized his official written police narrative in AFPD Incident Report No. 26AF04748 on June 3, 2026.

**47.** On June 4, 2026, AFPD employee Jamie Stowers responded via email to Plaintiff’s May 22, 2026 GRAMA request, producing Incident Report No. 26AF04748 (authored by Defendant Kitchen) along with AFPD dashcam video of the stop that contained no audio.

**48.** On June 5, 2026, Plaintiff contacted Jamie Stowers to inquire whether the audio had been redacted from the AFPD dashcam video. Ms. Stowers responded that there was no audio because the dashcam model in Defendant Kitchen’s vehicle was not set to record audio.

**49.** Upon reviewing Incident Report No. 26AF04748, Plaintiff discovered that Defendant Kitchen had deliberately authored and submitted statements on June 3, 2026, that

were fabricated after the fact to manufacture alternative probable cause, invert the sequence of events, and mischaracterize Plaintiff's demeanor, directly contradicting the objective dashcam video, the real-time roadside dialogue, and Defendant Kitchen's own May 27, 2026 recorded admissions.

**50.** Specifically, regarding Fabricated Pretextual Driving Violations & Invented "Double White Line" Claim, despite stating at the scene that Exit 317 was "not an exit lane for single drivers" and admitting on May 27, 2026, that he stopped Plaintiff solely because he mistakenly assumed the lane was an HOV exit-only lane, Defendant Kitchen pivoted on June 3, 2026, writing for the very first time: "On 5/21/26 shortly after entering the freeway I saw a dark Jeep in my rear view mirrors that was aggressively switching lanes, following too closely to vehicles in front of him and speeding. Just prior to exit 317 the Jeep entered the HOV lane to exit. I thought the Jeep entered the HOV lane while there was still a double white line so I initiated a traffic stop." Once Defendant Kitchen learned on May 27 that Exit 317 was a legal general-purpose exit, he fabricated the "double white line" and aggressive driving claims on June 3 to manufacture retroactive probable cause.

**51.** Regarding Inverting the Compliance and Agitation Timeline, in Paragraph 2 of his narrative, Defendant Kitchen wrote: "I then asked the driver if he'd like me to call highway to come break the window. That escalated the situation and the driver began yelling and then handed me his registration, insurance card and mistakenly handed me his military ID card." Defendant Kitchen deliberately distorted this sequence to conceal the fact that Plaintiff was initially completely calm and was already voluntarily handing over his credentials when Defendant Kitchen refused them and threatened to break his passenger-side window, and to obscure the fact that Plaintiff only became visibly upset and vocal AFTER Defendant Kitchen

refused to either complete the stop or let him go. Furthermore, Defendant Kitchen deliberately omitted from his report his explicit verbal confirmation that Plaintiff was "detained," his repeated statements refusing to write a ticket ("I'm not writing you a ticket"), and the fact that Plaintiff rolled up his window to invoke his right to remain silent when subjected to an unauthorized interrogation.

**52.** Regarding Selective Weaponization of Provoked First Amendment Speech, in Paragraph 3 of his narrative, Defendant Kitchen sought to portray Plaintiff as the aggressor by quoting Plaintiff's later vocal frustration ("Mr. Booker interrupted me and said he didn't want to hear what I had to say and fuck you give me my ticket... Mr. Booker responded with fuck you the carpool lane ends way back at Parrish lane, fuck you give me my ticket"), while omitting that Plaintiff only became upset after Defendant Kitchen held him on the side of the road, explicitly confirmed he was detained, and refused to either issue a ticket or release him.

**53.** Regarding Admission of Refusal to Identify, in Paragraphs 4–6 of his narrative, Defendant Kitchen admitted that when Plaintiff pulled up next to him at a red light demanding his name and badge number, "I informed Mr. Booker that our interaction was over. I rolled back up my window and continued to the freeway."

**54.** On June 8, 2026, AFPD Chief Cameron Paul confirmed via email to Plaintiff two critical administrative facts: (a) First, Chief Paul officially confirmed that Defendant Kitchen did not complete Incident Report No. 26AF04748 until June 3, 2026—proving conclusively that Defendant Kitchen wrote the report thirteen days after the May 21 stop and seven days after his May 27 recorded confession; and (b) Second, Chief Paul confirmed verbatim that the discipline imposed on Defendant Kitchen for the incident was limited to: "Apology to you (which he's

done), Letter of reprimand in his file, suspension of vehicle take home privileges. Warning that any future similar conduct will result in additional discipline, including and up to termination."

**55.** On June 9, 2026, Plaintiff verified via email with Jamie Stowers that Incident Report No. 26AF04748 was no longer classified as "protected" because the internal investigation was officially closed. Ms. Stowers confirmed via email that the report was no longer protected, rendering Defendant Kitchen's falsified June 3, 2026 narrative a permanent, open public record.

**56.** On August 11, 2026, Plaintiff attended a public hearing before the American Fork City Council and Mayor Brad Frost, where Plaintiff publicly notified the City's highest policymakers of Defendant Kitchen's unrecorded, off-the-books stop, his threats to use the Utah Highway Patrol to shatter Plaintiff's passenger-side window, his May 27 recorded confession, and his subsequent June 3 falsification of Incident Report No. 26AF04748. Plaintiff further warned the City Council of the danger of retaining an officer who fabricates reports and resorts to retaliatory threats as a School Resource Officer at American Fork Junior High School.

**57.** Despite having actual knowledge that Incident Report No. 26AF04748 was authored on June 3, 2026, and contained post-hoc fabrications contradicting the May 27, 2026 recorded call, Chief Paul, Mayor Frost, and the City of American Fork took no action to correct or expunge the false report or impose any discipline for untruthfulness, thereby ratifying Defendant Kitchen's fabrication of official records.

**E. City Leadership's Recorded Admissions of Notice, Immediate Knowledge, and Systemic Oversight Failure**

**58.** Municipal policymakers, including Mayor Brad Frost and Police Chief Cameron Paul, possessed immediate, real-time notice of Defendant Kitchen's unconstitutional encounter with Plaintiff and the widespread public fallout generated by its public release.

**59.** Specifically, in a recorded audio meeting conducted on August 10, 2026, between citizen journalist Daniel Sroka, Mayor Brad Frost, and Chief Cameron Paul at American Fork City Hall, Mayor Frost explicitly admitted on tape that he became aware of Defendant Kitchen's traffic stop of Plaintiff in 'real time' as soon as the video gained viral traction on the 'LackLuster' channel, acknowledging that the incident 'hit hard' and caused immediate administrative reverberations across city leadership.

**60.** During these recorded discussions and subsequent interviews regarding departmental oversight, Mayor Frost and Chief Paul acknowledged being inundated with hundreds of citizen complaints (including over 800 hostile communications) regarding AFPD officer misconduct, unconstitutional detentions, and lack of civilian oversight, yet deliberately minimized public concerns as 'myopic' or driven by outsiders, while taking no meaningful corrective action to establish independent third-party review or expunge falsified police records.

**61.** Furthermore, during recorded discussions with Mr. Sroka, Chief Paul explicitly defended departmental self-investigation procedures while admitting that AFPD officers involved in prior constitutional violations were permitted to resign without formal discipline or were retained with pay raises, demonstrating an ongoing custom of protecting officers who engage in misconduct, violating the administrative integrity standards established in AFPD Policy 346 (Personnel Complaints), and ratifying improper enforcement practices.

**F. Systemic Custom, Policy, and Pattern of Constitutional Violations by the City of American Fork**

**62.** The unconstitutional acts committed by Defendant Kitchen against Plaintiff were not isolated incidents, but the direct and proximate result of systemic policies, customs, and deliberate indifference on the part of Defendant City of American Fork.

**63.** Specifically, the City of American Fork and AFPD maintain an established pattern and practice of: (a) Conducting unlawful stops, warrantless entries, and retaliatory seizures against citizens who question police authority, as evidenced by multiple federal civil rights lawsuits pending against the City, including Norcross et al. v. City of American Fork et al., Case No. 2:26-cv-01008-RJS (D. Utah, filed Oct. 14, 2026), and Thorpe et al. v. Cedar Hills City / American Fork Police Department; (b) Obscuring and withholding officer identities: Maintaining a custom and practice of obscuring involved officers' identities from citizens attempting to exercise basic oversight—demonstrated directly by Defendant Kitchen's refusal to provide his name and badge number to Plaintiff at the red light following the stop—thereby frustrating public accountability, obstructing civilian oversight, and violating constitutional tracking obligations; (c) Permitting officers to conduct off-the-books enforcement actions without body-worn cameras, with dashcams configured not to record audio (as confirmed by Jamie Stowers on June 5, 2026), and without dispatch notification; and (d) Failing to adequately supervise or discipline officers who file false or post-hoc fabricated police reports (such as Incident Report No. 26AF04748, completed June 3, 2026) to cover up admitted constitutional violations.

## V. CAUSES OF ACTION

### COUNT I
### UNLAWFUL SEIZURE, UNLAWFULLY PROLONGED DETENTION, AND VIOLATION OF THE RIGHT TO REMAIN SILENT
### (42 U.S.C. § 1983 — Fourth, Fifth, and Fourteenth Amendments)

*(Against Defendant Bronson Kitchen)*

**64.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**65.** The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, guarantees the right of the people to be secure in their persons and effects against unreasonable seizures.

**66.** A traffic stop constitutes a seizure of the driver within the meaning of the Fourth Amendment and is constitutional only if justified at its inception by reasonable, articulable suspicion or probable cause, and must be reasonably limited in scope and duration. See Rodriguez v. United States, 575 U.S. 348 (2015).

**67.** When Defendant Kitchen stopped Plaintiff on May 21, 2026, at 16:25 near I-15 Exit 317 (US-89 S / 500 West), Plaintiff had committed no traffic infraction or criminal offense. Furthermore, Defendant Kitchen acted completely outside his territorial jurisdiction without legal authority or compliance with Utah's extraterritorial policing statutes, see Utah Code § 53-13-103(3) and Utah Code § 77-9-3. Defendant Kitchen's extraterritorial stop directly violated AFPD Policy 100.4 (Role and Authority), which restricts department members to exercising only the authority granted to them by law, AFPD Policy 100.2.2, by failing to establish any statutory trigger or notify local law enforcement authorities (Davis County/Farmington PD) prior to initiating enforcement action, and AFPD Policy 306.7, by engaging in routine traffic

enforcement outside municipal boundaries without an emergency threat. The HOV restriction had clearly terminated back near Parrish Lane prior to Plaintiff entering the exit lane—a fact objectively verifiable by road markings, captured on dashcam video, and explicitly admitted by both Chief Cameron Paul (at 11:16 AM on May 27, 2026) and Defendant Kitchen himself (at 14:47 on May 27, 2026).

**68.** Furthermore, even if the stop had not been unlawful at its inception, Defendant Kitchen unconstitutionally prolonged the seizure in violation of Rodriguez v. United States, 575 U.S. 348 (2015), by refusing to accept Plaintiff's calmly offered credentials, arguing a patently false HOV-exit theory ("It is not an exit lane for single drivers"), and explicitly admitting on camera that Plaintiff was "detained." Despite confirming the detention, Defendant Kitchen refused his primary mission of issuing a citation or releasing Plaintiff to leave, instead stating verbatim, "I'm not writing you a ticket," and attempting to force an unmonitored conversation ("What I was going to say..."). By holding Plaintiff and his documents hostage to conduct an unauthorized, non-consensual interrogation detour outside the scope of his lawful authority—until Plaintiff invoked his right to remain silent and rolled up his window—Defendant Kitchen committed a clear Fourth Amendment violation.

**69.** Defendant Kitchen's subsequent June 3, 2026 attempt in Incident Report No. 26AF04748 to invent retroactive driving violations ("aggressively switching lanes, following too closely to vehicles in front of him and speeding") and a false claim that he thought Plaintiff crossed a "double white line" is belied by the objective dashcam video, the real-time roadside dialogue, and his own May 27, 2026 recorded admission.

**70.** Any purported mistake of law or fact by Defendant Kitchen was objectively unreasonable, particularly given that Defendant Kitchen operated nearly forty miles outside his

primary municipal jurisdiction without territorial authority or compliance with Utah's extraterritorial policing statutes (see Utah Code § 53-13-103(3); Utah Code § 77-9-3) and departmental regulations (AFPD Policy 100.2.2; AFPD Policy 100.4; AFPD Policy 306.7), operated without body-worn camera activation, dashcam audio recording (AFPD Policy 326.3.1), or dispatch logging, ignored an actual HOV violator moments earlier, and refused to issue a citation when challenged. At the time of the stop on May 21, 2026, it was clearly established law under the Fourth Amendment that an officer may neither initiate a traffic stop without objectively reasonable suspicion, see United States v. Cortez, 449 U.S. 411, 417–18 (1981), nor prolong or divert from the mission of the stop to engage in unauthorized inquiries or roadside detours without independent reasonable suspicion, see Rodriguez v. United States, 575 U.S. 348, 354–57 (2015); United States v. Frazier, 30 F.4th 1165, 1173 (10th Cir. 2022) (holding that even de minimis delays caused by unrelated inquiries violate the Fourth Amendment in the absence of independent reasonable suspicion).

**71.** As a direct and proximate result of Defendant Kitchen's unlawful and prolonged seizure, Plaintiff suffered deprivation of his constitutional liberty, provoked emotional distress, humiliation, anxiety, and other damages in an amount to be proven at trial.

**COUNT II**
**FIRST AMENDMENT RETALIATION**
**(42 U.S.C. § 1983 — First and Fourteenth Amendments)**
*(Against Defendant Bronson Kitchen)*

**72.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**73.** The First Amendment to the United States Constitution guarantees citizens the right to verbally question, criticize, challenge—even using emphatic or profane language when

provoked by unlawful police detention—and record law enforcement officers in the performance of their public duties without fear of governmental retaliation. See City of Houston v. Hill, 482 U.S. 451, 461–63 (1987) (speech criticizing police is protected); Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019) (retaliatory enforcement without probable cause violates the First Amendment).

**74.** Plaintiff engaged in constitutionally protected activity under the First Amendment first when he calmly asked why he was being pulled over and explained that the HOV lane ended back at Parrish Lane, and subsequently when—after Defendant Kitchen refused his credentials, threatened to break his passenger-side window, and refused to either write a ticket or let him go—Plaintiff became visibly upset and vocally demanded his ticket ("the carpool lane ends way back at Parrish lane... give me my ticket"), recorded the encounter, requested Defendant Kitchen's name and badge number, and submitted a GRAMA request on May 22, 2026.

**75.** Because Plaintiff was completely calm and cooperative at the outset and only became visibly agitated after Defendant Kitchen refused to complete the stop or release him, Plaintiff's vocal frustration was protected speech provoked directly by Defendant Kitchen's unconstitutional detention, and cannot be used as a post-hoc justification for Defendant Kitchen's misconduct.

**76.** Defendant Kitchen responded to Plaintiff's protected speech and assertion of rights by becoming "amped up," refusing to accept offered credentials, threatening to call the Utah Highway Patrol ("highway") to violently shatter Plaintiff's passenger-side vehicle window, prolonging the detention without issuing a citation, rolling up his window to refuse identification, and subsequently authoring a falsified official police report (Incident Report No.

26AF04748) on June 3, 2026, designed to falsely accuse Plaintiff of aggressive driving, speeding, and crossing a double-white line while weaponizing Plaintiff's provoked frustration.

**77.** Defendant Kitchen's adverse actions would chill a person of ordinary firmness from continuing to engage in that constitutionally protected activity, and were substantially motivated as a direct response to Plaintiff's exercise of his First Amendment rights.

**78.** As a direct and proximate result of Defendant Kitchen's retaliatory conduct, Plaintiff suffered constitutional injury, emotional distress, reputational harm, and other damages in an amount to be proven at trial.

**COUNT III**
**UNLAWFUL THREAT OF EXCESSIVE FORCE AND UNREASONABLE SEIZURE ESCALATION**
**(42 U.S.C. § 1983 — Fourth and Fourteenth Amendments)**
*(Against Defendant Bronson Kitchen)*

**79.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**80.** Under the Fourth Amendment's objective reasonableness standard (Graham v. Connor, 490 U.S. 386 (1989)), law enforcement officers are prohibited from using or threatening to use unlawful physical force or property destruction against a peaceful, non-threatening motorist who is calmly and voluntarily complying with the law.

**81.** At the moment Defendant Kitchen threatened to summon the Utah Highway Patrol to shatter Plaintiff's passenger-side window, Plaintiff was completely calm, polite, and actively holding out his credentials to hand them over. Plaintiff posed zero threat to officer safety, made no attempt to flee, and was not agitated or hostile until AFTER Defendant Kitchen threatened his window and refused to either complete the stop or release him.

**82.** Because Defendant Kitchen lacked any lawful basis for the stop in the first instance, and because Plaintiff was calmly and voluntarily attempting to hand over his credentials through a partially lowered window, Defendant Kitchen's refusal to accept the documents and explicit threat to call "highway to come break the window"—condemned by Chief Cameron Paul during the nine-minute call on May 27, 2026—was an objectively unreasonable, unprovoked, and unconstitutional escalation of force under AFPD Policy 300 (Use of Force). Furthermore, Defendant Kitchen's conduct stripped away the administrative and legal "protective umbrella" described in the AFPD Policy Manual Preface, which conditions municipal protection on an officer's strict adherence to departmental policy and constitutional standards.

**83.** As a direct and proximate result of Defendant Kitchen's unconstitutional escalation and threats of force against a calm and compliant citizen, Plaintiff suffered fear, justifiable agitation, emotional distress, and deprivation of his Fourth Amendment rights.

## COUNT IV
## FABRICATION OF EVIDENCE / FALSIFICATION OF OFFICIAL POLICE REPORT
## (42 U.S.C. § 1983 — Fourth and Fourteenth Amendments / Procedural & Substantive Due Process)

*(Against Defendant Bronson Kitchen and DOES 1–10)*

**84.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**85.** The Fourteenth Amendment guarantees every citizen the right not to be subjected to deliberate fabrication of official law enforcement records or evidence by government officials acting under color of state law. See McDonough v. Smith, 139 S. Ct. 2149, 2155 (2019); Warnick v. Cooley, 895 F.3d 746, 753 (10th Cir. 2018).

**86.** On May 27, 2026, at 14:47, Defendant Kitchen explicitly confessed to Plaintiff in a recorded telephone call supervised by AFPD Sergeant Stowers that he had stopped Plaintiff under the erroneous assumption that Exit 317 was an HOV exit-only lane and that his roadside window-breaking threat was improper.

**87.** Seven days later, on June 3, 2026 (as confirmed via email by Chief Cameron Paul on June 8, 2026), Defendant Kitchen knowingly, intentionally, and with reckless disregard for the truth authored and finalized Official AFPD Incident Report No. 26AF04748—in direct violation of AFPD Policy 340 (Standards of Conduct — Truthfulness) and AFPD Policy 322 (Report Preparation), which strictly mandate honesty, complete accuracy, and integrity in all official duties and police record-keeping—containing three distinct material fabrications and distortions: (a) Newly Invented Driving Pretexts: Falsely claiming for the first time that prior to the stop he observed Plaintiff's Jeep "aggressively switching lanes, following too closely to vehicles in front of him and speeding"; (b) Newly Invented "Double White Line" Pretext: Falsely claiming that he initiated the stop because he thought Plaintiff entered the HOV lane "while there was still a double white line," directly contradicting both his roadside insistence that Exit 317 was "not an exit lane for single drivers" and his May 27 recorded admission; and (c) Inverted Compliance and Agitation Timeline: Falsely writing that his window-breaking threat "escalated the situation and the driver began yelling and then handed me his registration...", intentionally concealing that Plaintiff was completely calm and already attempting to hand over his credentials when Defendant Kitchen threatened his passenger-side window, and omitting that Plaintiff only became visibly agitated after Defendant Kitchen refused to either complete the stop or let Plaintiff go.

**88.** Defendant Kitchen fabricated these post-hoc allegations on June 3, 2026, to manufacture retroactive probable cause in an official government record, portray a calm and compliant citizen as the aggressor, shield himself from further discipline and Brady/Giglio impeachment tracking, and tarnish Plaintiff's reputation in a record that became permanently unprotected and public on June 9, 2026.

**89.** Upon information and belief, supervisory Defendants DOES 1–10 reviewed, approved, closed, and maintained Incident Report No. 26AF04748 in official city records as an unprotected public document despite possessing actual knowledge—via the dashcam video, Chief Paul's May 27 (11:16 AM) call, and Sergeant Stowers's participation in the May 27 (14:47) apology call—that the pretexts and timeline written on June 3, 2026, were false.

**90.** As a direct and proximate result of this deliberate falsification of official records, Plaintiff suffered constitutional injury, reputational harm, emotional distress, and forced expenditure of time and resources to clear his name.

## COUNT V
## MUNICIPAL LIABILITY — UNCONSTITUTIONAL CUSTOM, POLICY, RATIFICATION, AND FAILURE TO TRAIN/SUPERVISE
## (42 U.S.C. § 1983 — Monell v. Department of Social Services)

*(Against Defendant City of American Fork)*

**91.** Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**92.** Defendant City of American Fork is liable under 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978), because the constitutional violations suffered by Plaintiff were caused by the City's official policies, widespread customs and

practices, deliberate indifference in training and supervision, and post-hoc ratification by final policymakers.

**93.** Specifically, Defendant City of American Fork maintained and tolerated the following unconstitutional customs and practices: (a) Allowing AFPD officers to conduct unrecorded, off-the-books stops outside municipal boundaries without body-worn cameras, with dashcam models not set to record audio—in direct violation of AFPD Policy 326.3.1 (as confirmed by Jamie Stowers on June 5, 2026)—and without dispatch notification; (b) Obscuring and withholding officer identities: Maintaining a custom and practice of obscuring involved officers' identities from citizens attempting to exercise basic oversight—demonstrated directly by Defendant Kitchen's refusal to provide his name and badge number to Plaintiff at the red light following the stop—thereby frustrating public accountability, obstructing civilian oversight, and violating constitutional tracking obligations; (c) Tolerating a widespread pattern of Fourth and First Amendment violations by AFPD officers—including retaliatory arrests, unlawful traffic stops, and warrantless intrusions—as demonstrated by the Booker incident, the Thorpe incident, and the sweeping civil rights violations detailed in Norcross et al. v. City of American Fork et al., Case No. 2:26-cv-01008-RJS (D. Utah, filed Oct. 14, 2026), and Thorpe et al. v. Cedar Hills City / American Fork Police Department; and (d) Permitting officers to author and finalize false and inaccurate police reports (such as Incident Report No. 26AF04748, completed June 3, 2026) days after recorded confessions of error—in direct violation of AFPD Policy 340 (Standards of Conduct) requiring complete truthfulness in official record-keeping—and releasing those reports as open public records (as confirmed June 9, 2026) without correction or disciplinary consequence for untruthfulness.

**94.** Furthermore, as confirmed in the August 10, 2026 recorded meeting involving Mayor Brad Frost and Chief Cameron Paul, final municipal policymakers possessed immediate, real-time knowledge of Defendant Kitchen's unconstitutional stop and subsequent falsified report, acknowledging that the incident 'hit hard' in real time. Despite this actual knowledge, Chief Paul, Mayor Frost, and the City Council ratified Defendant Kitchen's June 3, 2026 falsification of Incident Report No. 26AF04748 by closing the investigation without adhering to AFPD Policy 346 (Personnel Complaints) procedures, removing the report's protected status on June 9, 2026, refusing to correct or expunge the fabricated narrative even after Plaintiff's August 11, 2026 presentation, failing to document the misconduct for mandatory Brady/Giglio compliance tracking, and continuing to employ Defendant Kitchen in positions of high public trust, including as a School Resource Officer.

**95.** The City's policies, customs, deliberate indifference, and ratification were the moving force behind the violations of Plaintiff's First, Fourth, Fifth, and Fourteenth Amendment rights.

## VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiff AARON BOOKER respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF AMERICAN FORK, BRONSON KITCHEN, and DOES 1–10, and grant the following relief:

**A.** A declaratory judgment that Defendants' acts, policies, practices, and omissions complained of herein violated and continue to violate Plaintiff's rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution;

**B.** Injunctive relief requiring Defendant City of American Fork and the American Fork Police Department to: (1) Expunge, retract, or formally correct the falsified official police

report (Incident Report No. 26AF04748, completed June 3, 2026) authored by Defendant Bronson Kitchen regarding the May 21, 2026 traffic stop of Plaintiff; (2) Implement mandatory body-worn camera activation, dashcam audio recording, dispatch logging, and officer self-identification protocols for all extraterritorial and municipal traffic stops; and (3) Properly document and disclose Defendant Kitchen's admitted improper stop, improper threat of force, and post-apology false reporting in Incident Report No. 26AF04748 for Brady/Giglio compliance;

**C.** Compensatory and general damages against all Defendants, jointly and severally, in an amount to be determined by a jury at trial, for the violation of Plaintiff's constitutional rights, emotional distress, humiliation, and reputational harm;

**D.** Punitive damages against Defendant Bronson Kitchen and DOES 1–10 in their individual capacities, in an amount to be determined by a jury at trial, to punish and deter such willful, malicious, and reckless misconduct in the future;

**E.** Nominal damages for the violation of Plaintiff's constitutional rights;

**F.** Reasonable costs of suit, filing fees, and litigation expenses incurred herein pursuant to 42 U.S.C. § 1988 and applicable federal law (including attorney's fees in the event Plaintiff retains legal counsel during the pendency of this action);

**G.** Pre-judgment and post-judgment interest as permitted by law; and

**H.** Such other and further relief as this Court deems just, equitable, and proper.

**VII. DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff AARON BOOKER hereby demands a trial by jury on all issues and claims triable of right by a jury in this action.

DATED this 1st day of November, 2026.

Respectfully submitted,

/s/ Aaron Booker

AARON BOOKER
Plaintiff Pro Se
20 South Main Street, Unit 163
Bountiful, Utah 84011
Telephone: (385) 350-0517
aaron.booker.litigation@gmail.com